CINCINNATI BAR ASSOCIATION ET AL. *v.* LAWSON.

[Cite as *Cincinnati Bar Assn. v. Lawson,*
119 Ohio St.3d 58, 2008-Ohio-3340.]

(No. 2008–0107—Submitted February 27, 2008—Decided July 9, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Kenneth L. Lawson of Cincinnati, Ohio, Attorney Registration No. 0042468, was admitted to the practice of law in Ohio in 1989. We ordered an interim remedial suspension of respondent's license on May 15, 2007, pursuant to Gov.Bar R. V(5a)(B), upon receiving evidence that his continued practice posed a substantial threat of serious harm to the public. See *Disciplinary Counsel v. Lawson,* 113 Ohio St.3d 1508, 2007-Ohio-2333, 866 N.E.2d 508.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we now indefinitely suspend respondent's license, based on findings that he repeatedly violated ethical standards in representing clients and then failed to cooperate in investigations as to much of that misconduct. We agree that respondent engaged in a pervasive pattern of professional misconduct and that an indefinite suspension is the appropriate sanction.

{¶ 3} Relator Cincinnati Bar Association charged respondent with 16 counts of misconduct, alleging various violations of the Code of Professional Responsibility, the Ohio Rules of Professional Conduct ("Prof.Cond.R."),[1] and Gov.Bar R. V(4)(G) (requiring a lawyer to cooperate in a disciplinary investigation). In a separate complaint, relator Disciplinary Counsel charged respondent with four additional counts of misconduct. A panel of the board heard all the allegations on October 15 and 16, 2007, in consolidated proceedings. The panel then made numerous findings of misconduct and recommended the indefinite suspension, a recommendation the board adopted.

{¶ 4} Neither party objects to the board's report.

---

1. Some events underlying the Cincinnati Bar Association's charges took place after February 1, 2007, the effective date of the Ohio Rules of Professional Conduct, which supersede the Disciplinary Rules of the Ohio Code of Professional Responsibility.

## Misconduct

### Failure to Cooperate in the Disciplinary Investigation

{¶ 5} Respondent stipulated that he violated Gov.Bar R. V(4)(G) during investigations of nine grievances lodged against him prior to February 1, 2007, by failing to respond to relators' inquiries and to provide requested records. On that date, respondent admitted himself to a rehabilitation facility after more than seven years of drug abuse. Respondent has participated appropriately in the disciplinary proceedings since his discharge, providing truthful, cooperative, and forthcoming responses to authorities.

{¶ 6} We find that respondent repeatedly violated Gov.Bar R. V(4)(G).

### The Chambers Grievance

{¶ 7} Janette Hanson Chambers hired respondent's law firm, Lawson & Washington, L.P.A. ("L & W"), in August 2005 to represent her in a potential criminal matter arising out of her administration of her mother's estate. Though Chambers had intended to retain respondent, she met initially with his partner, David Washington, who took the case on the firm's behalf. Chambers understood that respondent would be working in conjunction with Washington on her case.

{¶ 8} Chambers advanced the firm $10,000, expecting to be charged against that amount at $175 per hour. L & W did not place these unearned funds in an interest-bearing client trust account as required, depositing the money instead into the firm's office operating account. Respondent admits that he immediately received his share of the $10,000 in fees.

{¶ 9} Except for three consultations, L & W did nothing for Chambers's $10,000. Chambers had to appear in court without her lawyers, and the dispute eventually ended with Chambers losing her inheritance. She tried to discharge L & W in December 2005, only to learn that the firm had dissolved. Chambers asked respondent to account for her funds and refund unearned fees, but respondent has never replied.

{¶ 10} Respondent testified that he did not realize his former law firm's debt to Chambers until her demand for a refund. He admitted owing the debt and that he had repaid nothing. He also admitted that he committed the misconduct charged against him with respect to this client.

{¶ 11} Respondent did not represent Chambers in accordance with the duties set forth in DR 9–102(A) (requiring a lawyer to maintain client funds in a separate identifiable bank account), 9–102(B)(4) (requiring a lawyer to deliver funds in the lawyer's possession to which the client is entitled), and 9–102(E)(1) (requiring lawyers to maintain clients' funds in interest-bearing client trust

accounts in accordance with statutory requirements). We find him in violation of these rules.

## The Collins Grievance

{¶ 12} Joseph Collins hired respondent in February 2006 to defend him against a charge of menacing, paying respondent $750. Some confusion as to the date of an arraignment ensued, and neither Collins nor respondent appeared on the scheduled court date. The court issued a warrant for Collins's arrest, but respondent's associate had the proceeding rescheduled, and respondent managed to prevent the client's arrest. Respondent failed to appear with Collins on the new arraignment date.

{¶ 13} Collins discharged respondent, attempted to represent himself, and was convicted of disorderly conduct. Collins sued respondent for the $750 fee he had paid in small claims court, and respondent has sought a jury trial. Respondent has not returned any of the fee.

{¶ 14} By missing the court date, abandoning his client's defense, and keeping unearned fees, respondent did not represent Collins in accordance with the duties set forth in DR 6–101(A)(2) (prohibiting a lawyer from providing representation without adequate preparation), 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter), 7–101(A)(2) (prohibiting a lawyer from intentionally failing to carry out a contract of employment), 7–101(A)(3) (prohibiting a lawyer from intentionally prejudicing or damaging a client during their professional relationship), and 9–102(B)(4). We therefore find him in violation of these rules.

## The William Richardson Grievance

{¶ 15} William Richardson hired respondent in late 2003 to file a defamation suit on his behalf, paying $1,500 in fees. Respondent's associates researched the claim, determined that it was not viable, and advised his client. Respondent offered to return $500 of Richardson's money or to pursue other claims that he considered more feasible, but Richardson wanted to pursue the defamation claim. Respondent did nothing more in the case but did not return any part of his fee.

{¶ 16} Respondent stipulated that he did not represent this client in accordance with the duties set forth in DR 6–101(A)(1) (prohibiting a lawyer from knowingly attempting to provide representation that the lawyer is not competent to handle), 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), and 9–102(B)(4). We find him in violation of these rules.

## The Antwan Richardson Grievance

{¶ 17} In May 2004, respondent represented Antwan Richardson in federal district court at his sentencing on a drug-trafficking conviction. The court denied respondent's motion to withdraw Richardson's guilty plea, and respondent filed

an appeal. On appeal, respondent failed to comply with a briefing schedule, even after he received three extensions over two months. In February 2005, the appellate court dismissed Richardson's appeal for failure to prosecute.

{¶ 18} Respondent then moved for resentencing in the trial court, asserting various constitutional arguments. Because no one had raised these arguments at the original sentencing proceeding or on direct appeal, the court denied the motion. Respondent informed Richardson that he was filing the motion for resentencing but said nothing about the reason the appeal had been dismissed.

{¶ 19} Respondent stipulated that he did not represent this client in accordance with the duties set forth in DR 6–101(A)(2), 6–101(A)(3), and 7–101(A)(2). We find him in violation of these rules. Because respondent's failure to file a brief despite ample opportunity caused the dismissal of his client's appeal, we also find him in violation of DR 7–101(A)(3).

## The Harris Grievance

{¶ 20} In 2003, Ronald and Paulette Harris paid respondent $1,400 to represent them in various legal actions, including a civil rights action. Respondent filed the civil rights claim in June 2004 but then took no action in the case for over one year. When the defendant moved for summary judgment, respondent failed to file any response.

{¶ 21} Upon respondent's request, the court granted an extension, allowing him nearly one month more to oppose summary judgment. Respondent again missed his deadline, and the court granted summary judgment against his clients. Respondent failed to tell his clients about the defendant's motion until after the court's ruling.

{¶ 22} Respondent stipulated that he did not represent the Harrises in accordance with the duties set forth in DR 6–101(A)(1), 6–101(A)(2), 6–101(A)(3), and 7–101(A)(2). We find him in violation of these rules. Because respondent's failure to oppose the motion for summary judgment caused judgment to be entered against his clients, we also find him in violation of DR 7–101(A)(3).

## The Onwuzuruigo Grievance

{¶ 23} Nelson Onwuzuruigo paid respondent $1,500 in April 2005 to prosecute an appeal from a criminal conviction in municipal court. The court of appeals dismissed the case when respondent failed to file his brief on time. Respondent managed to have the appeal reinstated, but again failed to file a brief, even after the court issued an order to show cause why the case should not be dismissed.

{¶ 24} In the meantime, Onwuzuruigo tried many times to contact respondent about the status of his case without success. Respondent failed to communicate with the client, return unearned fees, or account for his client's money.

{¶ 25} Respondent stipulated that he did not represent Onwuzuruigo in accordance with the duties set forth in DR 6–101(A)(1), 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), and 9–102(B)(4). He admitted during the panel hearing that he had also violated 7–101(A)(3). We find him in violation of these rules.

### The Leahr Grievance

{¶ 26} Michelle Leahr retained respondent in December 2003 to file a wrongful-death action, agreeing to pay him a contingent fee upon recovery. No one filed the lawsuit or responded to Leahr's telephone calls about the case.

{¶ 27} Finally, in mid-May 2005, Leahr sent a letter discharging respondent and requesting the return of her case file. Just days later, she received a letter in which respondent's associate refused to return the file unless Leahr paid an unspecified amount of legal fees. The letter also threatened legal action if Leahr did not pay.

{¶ 28} As of the date of the panel hearing, Leahr had paid respondent nothing, and he had not returned her file. The statute of limitations for Leahr's wrongful-death action had elapsed by that time, precluding her from pursuing damages for her loss.

{¶ 29} Respondent stipulated that he did not represent Leahr in accordance with the duties set forth in DR 2–110(A)(2) (precluding a lawyer's improper withdrawal from employment), 6–101(A)(1), 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), and 9–102(B)(4). Agreeing that his associate had tried to convert the contingent fee into an hourly fee, he also admitted during the panel hearing to a violation of DR 2–106(B) (precluding a lawyer from charging a clearly excessive fee). We find him in violation of these rules. Moreover, because respondent kept his client's file until it was too late to file her claim, we find a violation of DR 7–101(A)(3).

### The Hammond Grievance

{¶ 30} Charles Hammond paid respondent $1,000 in October 2005 to appeal his son's conviction. Respondent filed the notice of appeal; however, he did nothing more in the case, and in March 2006, the court of appeals dismissed it. Respondent failed to advise his client or the client's father of the dismissal and did not account for any of Hammond's money.

{¶ 31} Respondent stipulated or does not dispute that he failed to represent Hammond's son in accordance with the duties set forth in DR 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), 9–102(B)(3) (requiring a lawyer to maintain complete records and account for clients' property in lawyer's possession), and 9–102(B)(4). We find him in violation of these rules.

### The Love Grievance

{¶ 32} Lynette Love hired respondent in September 2006 to represent her in a dispute with a former employer, paying a $500 fee. Respondent did not do the work he promised, and Love had to try to resolve the dispute on her own. As of the hearing date, respondent had neither accounted to Love for her money nor refunded any unearned fees.

{¶ 33} Respondent stipulated or does not dispute that he failed to represent Love in accordance with the duties set forth in DR 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), 9–102(B)(3), and 9–102(B)(4). We find respondent in violation of these rules.

### The Jones Grievance

{¶ 34} William and Dorothy Jones hired respondent in November 2006 to counsel them on the viability of an action to obtain their son's early release from prison. The couple paid respondent $750 and two weeks later began inquiring about the status of their son's case. The couple called respondent at least ten times but were never able to speak with him. They scheduled two appointments, but both were canceled.

{¶ 35} In January 2007, the Joneses sent respondent a letter discharging him. The couple also requested the return of their file and a refund. As of the panel hearing, respondent had neither returned the Joneses' file nor repaid any unearned fees.

{¶ 36} Respondent stipulated or does not dispute that he failed to represent the Joneses in accordance with the duties set forth in DR 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), 9–102(B)(3), and 9–102(B)(4). We find him in violation of these rules.

### Client Trust–Account Improprieties

{¶ 37} In February 2007, respondent's assistant drew a check for $1,230 from his client trust account to pay rent for the firm's office space. In addition to this improper withdrawal of funds held in trust, the bank's return of the check for insufficient funds signaled other improper withdrawals. Respondent was in treatment for his addiction by this time, but he had been misusing funds in his client trust account, authorizing employees to pay office expenses from that account.

{¶ 38} Prof.Cond.R. 1.15(a) requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property * * * in a separate interest-bearing account in a financial institution." By using entrusted client funds for purposes other than the client's representation, respondent did not maintain his client trust

account in accordance with this rule. We therefore find him in violation of Prof.Cond.R. 1.15(a).

{¶ 39} With respect to nonlawyer assistants, Prof.Cond.R. 5.3(a) requires a lawyer who individually possesses managerial authority over the assistant to "make *reasonable* efforts to ensure that the *firm* * * * has in effect measures giving *reasonable* assurance that the person's conduct is compatible with the professional obligations of the lawyer." (Emphasis added.) Section (b) of the rule requires a lawyer having direct supervisory authority over the assistant to "make *reasonable* efforts to ensure that the person's conduct is compatible with professional obligations of the lawyer." (Emphasis added.) "Reasonable" denotes the conduct of a "reasonably prudent and competent lawyer." Prof. Cond.R. 1.0(i).

{¶ 40} Violations of Prof.Cond.R. 5.3(a) and (b) occur when (1) a lawyer orders an assistant to perform an act incompatible with professional obligations or knowingly ratifies such conduct, or (2) a lawyer having managerial or supervisory authority knows of conduct that is incompatible with professional obligations and could, but fails to, take reasonable remedial action. "Knowingly" or "knows" denotes "actual knowledge of the fact in question" and "may be inferred from circumstances." Prof.Cond.R. 1.0(g).

{¶ 41} Respondent allowed his employee to misuse funds in his client trust account, conduct that is incompatible with a lawyer's professional obligation to protect client property. He does not dispute that he acted knowingly, nor does he suggest that his actions were those of a reasonably prudent and competent lawyer. We therefore find him in violation of Prof.Cond.R. 5.3(a) and (b).

### The Hickey Grievance

{¶ 42} In December 2004, respondent agreed to file a civil rights suit for James Hickey in federal district court, accepting a $3,500 fee. He filed the suit in February 2005. In mid-April 2006, respondent moved for a voluntary dismissal after the court threatened dismissal for his failure to comply with outstanding discovery requests.

{¶ 43} Shortly thereafter, the district court dismissed Hickey's claim for failure to comply with the discovery order. Though the dismissal was without prejudice, the court ordered as a condition of refiling that Hickey pay the defendant's costs. Respondent told his client that he had dismissed the case but did not mention the reason for the dismissal or the sanction that the court imposed.

{¶ 44} Respondent refiled Hickey's civil rights suit in December 2006 but failed to perfect service on defendants. On April 23, 2007, the district court gave respondent until May 18, 2007, to obtain service. Our interim suspension order took effect three days before this deadline, requiring respondent to withdraw

from Hickey's case and seek successor counsel. Respondent never accounted to Hickey for the $3,500 fee.

{¶ 45} Respondent stipulated or does not dispute that he failed to represent Hickey during 2005 and 2006 in accordance with the standards set forth in DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving fraud, dishonesty, deceit, or misrepresentation) 6–101(A)(1), 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), and 9–102(B)(3). We find him in violation of these rules.

{¶ 46} Prof.Cond.R. 1.1 requires a lawyer to "provide competent representation to a client." "Competent representation" under the rule requires "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Prof.Cond.R. 1.3 requires a lawyer to act with "reasonable diligence and promptness in representing a client."

{¶ 47} A reasonably prudent and competent lawyer does not ignore a failed attempt to serve a complaint and summons for over four months. Nor does such a lawyer delay several more weeks after a court order directing him to perfect service. Finally, a reasonably prudent and competent lawyer conscientiously accounts for client funds and, at the end of the representation, retains only fees owed for his or her services.

{¶ 48} Respondent conceded at the panel hearing that his failure to obtain service of process during the first half of 2007 and to account for and refund any unearned fees violated Prof.Cond.R. 1.1 and 1.3. We find respondent in violation of these rules.

### The Montgomery Grievance

{¶ 49} Jodie Montgomery paid respondent $3,000 in November 2006 to represent her son after his arrest. Respondent did some work in the case during 2007 but not enough to justify his fee. Later, after our interim suspension, respondent failed to give up the Montgomery case file. Though he produced the file after Montgomery filed a grievance, he never accounted for her money or refunded unearned fees.

{¶ 50} Respondent stipulated or does not dispute that he failed to represent Montgomery's son in accordance with the duties set forth in DR 6–101(A)(2), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), 9–102(B)(3), and 9–102(B)(4). We therefore find him in violation of these rules.

{¶ 51} Except in situations not relevant here, Prof.Cond.R. 1.15(d) requires a lawyer to "promptly deliver to the client * * * any funds or other property that the client * * * is entitled to receive." Upon request, the lawyer is also required to "promptly render a full accounting regarding such funds or property." Id. Because respondent does not dispute that Montgomery asked for her file during 2007 or that he did not produce it promptly, we find him in violation of this rule.

{¶ 52} Prof.Cond.R. 1.16(d) requires a lawyer to "take steps, to the extent reasonably practicable, to protect the client's interest" upon termination of the representation. These steps include "delivering to the client all papers and property to which the client is entitled." We find respondent in violation of this rule because he withdrew from Montgomery's case without contemporaneously locating or returning her file.

{¶ 53} Except in a situation not relevant here, Prof.Cond.R. 1.16(e) requires a lawyer who withdraws from employment to "refund promptly any part of a fee paid in advance that has not been earned." We find respondent in violation of this rule because he failed to repay Montgomery the unearned portion of her $3,000 after his 2007 withdrawal.

### The Moore Grievance

{¶ 54} Clarence Moore hired respondent in January 2007 to defend him in a criminal case. Moore paid respondent $2,000 of a quoted $4,000 fee at that time, and by April 2007, Moore had paid the $2,000 balance. Respondent did nothing in Moore's case except file an appearance, move for continuances, and meet twice with a prosecutor. Moreover, respondent had to withdraw from Moore's case because of his interim suspension, but he has been unable to locate and return Moore's case file and has neither accounted for Moore's $4,000 nor refunded unearned fees.

{¶ 55} Respondent did not provide Moore the competent representation required by Prof.Cond.R. 1.1 because he did not conscientiously prepare and thoroughly pursue his client's defense. At the same time, he did not act with reasonable diligence and promptness as required by Prof.Cond.R. 1.3 because he did little for his client for nearly six months. We therefore find respondent in violation of these rules.

{¶ 56} Moreover, we find respondent in violation of Prof.Cond.R. 1.15(d) because he has been unable to locate Moore's file and has not disputed Moore's 2007 request for it. We also find respondent in violation of Prof.Cond.R. 1.16(d) and (e) because he withdrew from Moore's case without providing Moore's new attorney the case file or promptly refunding unearned portions of Moore's $4,000 fee.

### Misappropriation of Clients' Settlement Proceeds and Related Improprieties

{¶ 57} Respondent won acquittals for six clients charged with criminal offenses after the riots in Cincinnati during 2000. In 2002, he brought civil rights actions on behalf of his clients against the city. The parties ultimately settled their claims for $21,000 and agreed on how to divide the proceeds, including that respondent would receive a one-third share for his services.

{¶ 58} In early July 2005, respondent received separate settlement checks made out to each of the six clients. He endorsed the checks without the clients' knowledge and deposited the funds in his client trust account. The next day, respondent withdrew $15,787.07, more than twice his fee, from the client trust account and used the money to pay past-due amounts on his personal mortgage. Respondent used the remaining settlement proceeds for purposes unrelated to the interests of his six clients.

{¶ 59} When respondent failed to distribute the settlement proceeds, his clients began to inquire about their money. At the end of 2005, respondent sent a letter informing the clients that he was calculating his expenses and would be sending out their share of the settlement on January 15, 2006. Three of the clients filed grievances when they did not receive their checks as promised. As of the panel hearing, respondent had paid only three of the six clients.

{¶ 60} Respondent also misled representatives of the Disciplinary Counsel. When asked during a deposition what he had done with the settlement proceeds, respondent falsely testified that he thought he had distributed the money to his clients. Respondent later retracted his statement and confessed that he had misappropriated the funds in question. Respondent also lied during the investigation about his illegal abuse of prescription and other drugs, claiming that manifestations of his addiction were instead symptoms of multiple sclerosis.

{¶ 61} Respondent stipulated that he did not represent these clients in accordance with the duties set forth in DR 1–102(A)(6), 9–102(B)(1) (requiring a lawyer to promptly notify a client of the receipt of all funds, securities, and other properties), and 9–102(B)(3). We find him in violation of these rules. Because respondent misappropriated client funds and then lied about the theft and his illegal drug use to authorities, we also him find in violation of DR 1–102(A)(3) (a lawyer shall not engage in illegal conduct involving moral turpitude), 1–102(A)(4), 1–102(A)(5), and 9–102(B)(4).

*Additional Client Trust Account Improprieties*

{¶ 62} Since at least 2005, respondent has used his client trust account at PNC Bank for personal expenses and for cash withdrawals and has commingled his personal and client funds. Respondent admitted that he misused his client trust account to avoid creditors, particularly the Internal Revenue Service, to which he owed substantial sums, and to purchase drugs. He also admitted having lied about these improprieties during the Disciplinary Counsel's investigation, including having attributed overdrafts in his client trust account to employee theft.

{¶ 63} Respondent stipulated that he did not manage his client trust account in accordance with the duties in DR 1–102(A)(6), 9–102(A), and 9–102(B)(3). We find him in violation of these rules. Because respondent lied to authorities about

commingling his personal and client funds, we also find him in violation of DR 1–102(A)(4) and 1–102(A)(5).

## Sanction

{¶ 64} As the panel and board observed, we typically disbar lawyers for misconduct as pervasive and devastating as that in which respondent has engaged. See, e.g., *Cuyahoga Cty. Bar Assn. v. Jurczenko*, 114 Ohio St.3d 229, 2007-Ohio-3675, 871 N.E.2d 564, ¶ 34 (lawyer disbarred for 17 counts of misconduct involving misappropriation of client funds, practicing under a suspended license, commingling personal and client funds, failing to return client case files, and failing to cooperate in the disciplinary investigation); *Cincinnati Bar Assn. v. Selnick* (2001), 94 Ohio St.3d 1, 9, 759 N.E.2d 764 (lawyer disbarred for a systemic pattern of misconduct); and *Columbus Bar Assn. v. James* (1999), 84 Ohio St.3d 379, 704 N.E.2d 241 (same). Indeed, when misconduct permeates a law practice, "disbarment is often the only sanction available for preserving the public confidence in the judicial system." *Disciplinary Counsel v. Golden*, 97 Ohio St.3d 230, 2002-Ohio-5934, 778 N.E.2d 564, ¶ 23, citing *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 726 N.E.2d 993.

{¶ 65} To determine the appropriate sanction, however, we factor into our decision the aggravating and mitigating factors of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 66} The aggravating factors are significant. Respondent acted dishonestly and selfishly in misappropriating his clients' money and neglecting their cases. See BCGD Proc.Reg. 10(B)(1)(b). At the same time, he was obtaining painkilling medication illicitly by obtaining phony prescriptions from his doctor. Respondent's pattern of misconduct and multiple offenses spanned years, jeopardized numerous clients' interests, and cost clients more than $40,000, which he may never be able to repay. BCGD Proc.Reg. 10(B)(1)(c), (d), (h), and (i). On top of these misdeeds, respondent lied to investigators, impeding the disciplinary process. BCGD Proc.Reg. 10(B)(1)(e).

{¶ 67} But the mitigating evidence is also significant. Of great weight were the testimonials describing what had once been respondent's thriving practice and the contributions he has made to clients and the community. Many witnesses, including two federal district court judges and a federal magistrate, described respondent as a talented trial attorney committed to an underserved segment of the Cincinnati area, extolling his skill, dedication, and professional largesse. Though a prominent and successful practitioner, respondent had routinely taken criminal cases pro bono to defend basic rights of the accused, as he did for the six clients acquitted after the riots in 2001, or pursuing civil rights actions to end

injustices against the underprivileged. And when the city experienced racial unrest, respondent provided invaluable assistance in establishing a collaborative relationship between police and the local African–American leaders. Witnesses insisted that respondent's expertise in and devotion to such causes would be greatly missed if he were never able to practice law again, with his absence leaving a huge void in the legal profession.

{¶ 68} Also compelling was evidence showing how respondent's chemical dependence had contributed to cause his misconduct. Respondent's prescription drug use began innocently in 1999, when he needed medication to manage pain from a shoulder injury. He started with the painkillers Percodan and Percocet, but as his tolerance increased, he graduated to OxyContin. In time, respondent required approximately 180 pills per day at a cost of approximately $1,000. He also used at various times cocaine, marijuana, and Valium.

{¶ 69} Respondent emotionally recounted how his addiction overshadowed and then destroyed his ability to practice law in accordance with ethical standards. Apologizing for his many misdeeds, respondent admitted that he had been "high" for seven years prior to his February 2007 hospitalization, all the while still trying cases, advising clients, writing briefs, and otherwise attempting to manage his practice. His personal life also suffered. As just one example, respondent confessed that he had been high at the births of his two youngest children and that until his detoxification, those children had never seen him any other way.

{¶ 70} Respondent checked into Talbot Hall at the Ohio State University Hospital detoxification unit, where his addiction was confirmed, and he remained there for five days. Upon discharge, he at first commuted between Cincinnati and Columbus three times per week to participate in intensive outpatient treatment. When weather conditions prevented his travel, he enrolled in another intensive outpatient treatment program at Christ Hospital in Cincinnati. He completed that program successfully in August 2007.

{¶ 71} Contemporaneous with his medical care, respondent joined Alcoholics Anonymous ("AA") and embraced its "12–Step" program. He attends meetings at least three times a day, seven days a week, and works every day at the AA facility near his home, trying to help other addicts and performing chores as needed. In April 2007, respondent also signed a five-year Ohio Lawyers Assistance Program ("OLAP") contract with which he is in compliance. He has been drug- and alcohol-free since February 1, 2007, and his treatment counselor rated his prognosis for continued sobriety at nine on a scale of ten.

{¶ 72} Chemical dependence is of mitigating effect when the test in BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv) is met. The test requires (1) a diagnosis of chemical dependency by a qualified health-care professional or substance-abuse counselor, (2) proof that the condition contributed to cause the misconduct, (3)

certification that the lawyer has successfully completed an approved treatment program, and (4) a prognosis from a qualified health-care professional or substance-abuse counselor that the lawyer will be able to return, with conditions if necessary, to competent and ethical practice. Respondent has satisfied these requirements.

{¶ 73} "[T]he primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public." *Disciplinary Counsel v. O'Neill,* 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. Accord *Disciplinary Counsel v. Fumich,* 116 Ohio St.3d 257, 2007-Ohio-6040, 878 N.E.2d 6, ¶ 17, and *Ohio State Bar Assn. v. Weaver* (1975), 41 Ohio St.2d 97, 100, 70 O.O.2d 175, 322 N.E.2d 665. Thus, even in cases of egregious misconduct and illegal drug use, we have decided against permanent disbarment based on the lawyer's probable recovery from the drug addiction that caused the ethical breaches. See, e.g., *Disciplinary Counsel v. Garrity,* 98 Ohio St.3d 317, 2003-Ohio-740, 784 N.E.2d 691, ¶ 12 (lawyer and former pharmacist convicted of stealing prescription drugs suspended indefinitely after showing renewed dedication to his treatment for his addiction). We tailor the sanction, when appropriate, to assist in and monitor the attorney's recovery. *Cincinnati Bar Assn. v. Washington,* 109 Ohio St.3d 308, 2006-Ohio-2423, 847 N.E.2d 435, ¶ 9.

{¶ 74} From the evidence of respondent's character, reputation, remorse, chemical dependence, and recovery efforts, the panel and board concluded that he had made a case for eventually practicing law again. We agree. Respondent's addiction severely compromised the interests of his clients, the legal system, the legal profession, and the public. But many have expressed confidence is his ability to maintain sobriety and regain his ethical bearings.

{¶ 75} We accept the recommendation for an indefinite suspension, complete with the conditions for respondent's reinstatement. Respondent is indefinitely suspended from the practice of law in Ohio. In addition to the requirements of Gov.Bar R. V(10)(B), respondent shall show the following upon petitioning for reinstatement: (1) that he has been continuously sober during his suspension and has otherwise complied with his OLAP contract, (2) that he has maintained his active involvement in AA, (3) through the report of a qualified health-care professional or substance-abuse counselor, that he is capable of returning to the ethical and professional practice of law, and (4) that he has made restitution to all grievants. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, O'CONNOR, LANZINGER, and CUPP, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON and O'DONNELL, JJ., dissent.

MOYER, C.J., dissenting.

{¶ 76} I respectfully dissent. In view of the seriousness and frequency of the misconduct at issue, I would disbar the respondent.

{¶ 77} As the majority notes, we ordered an interim remedial suspension of respondent's license in May 2007, pursuant to Gov.Bar R. V(5a)(B). An interim remedial suspension is an extraordinary remedy that we order only when there is evidence that a lawyer's continued practice poses a substantial threat of serious harm to the public. See *Columbus Bar Assn. v. Smith*, 100 Ohio St.3d 278, 2003-Ohio-5751, 798 N.E.2d 592, ¶ 1. I continue to believe that an extraordinary remedy is appropriate in the present case.

{¶ 78} The majority's account of the respondent's behavior reveals a pattern of neglect and financial malfeasance. The respondent committed 21 acts of misconduct, all from 2003 to 2007, thereby violating numerous Disciplinary Rules, including 11 violations of DR 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter), 11 violations of DR 7–101(A)(2) (prohibiting a lawyer from intentionally failing to carry out a contract of employment), nine violations of DR 7–101(A)(3) (prohibiting a lawyer from intentionally prejudicing or damaging a client during their professional relationship), and ten violations of DR 9–102(B)(4) (requiring a lawyer to deliver funds in the lawyer's possession to which the client is entitled). As the majority recognizes, "we typically disbar lawyers for misconduct as pervasive and devastating as that in which respondent has engaged." We should follow our precedent here.

{¶ 79} The respondent's financial malfeasance is of particular concern. We have previously recognized that violations of DR 9–102(B)(4) "are tantamount to a misappropriation of client funds and property" and that "the normal sanction for misappropriation of client funds coupled with neglect of client matters is disbarment." *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993. In *Glatki*, we disbarred an attorney who had violated DR 9–102(B)(4) in three client matters. Id. at 383, 726 N.E.2d 993. The respondent here violated that rule in ten client matters. We typically disbar lawyers for misappropriation of client funds and property, and we should disbar the respondent for the egregious acts of financial malfeasance committed here.

{¶ 80} I recognize the existence of the two mitigating factors cited by the majority: first, the contributions the respondent has made to clients and the community; second, the influence of the respondent's chemical dependence on his misconduct, as well as the respondent's subsequent completion of an approved treatment program and the positive prognosis for his continued stability. Nevertheless, "any mitigating factor * * * must be weighed against the seriousness of the rule violations that the lawyer has committed." *Disciplinary Counsel v.*

*Phillips,* 108 Ohio St.3d 331, 2006-Ohio-1064, 843 N.E.2d 775, ¶ 13. We have previously disbarred an attorney despite the influence of the attorney's chemical dependency on his misconduct. Id. In the present case, the respondent ignored his clients' interests and stole their money. He used his client trust-fund account to avoid creditors and purchase drugs. He lied to the Disciplinary Counsel about his illegal use of drugs, as well as his use of settlement proceeds and a client trust fund for personal uses. The great weight of his misconduct cannot be lifted by the mitigating factors cited by the majority. I would therefore disbar the respondent.

LUNDBERG STRATTON and O'DONNELL, JJ., concur in the foregoing opinion.

---

Robert J. Hollingsworth and Peter Rosenwald, for relator Cincinnati Bar Association.

Jonathan E. Coughlan, Disciplinary Counsel, and Robert Berger, Assistant Disciplinary Counsel, for relator Disciplinary Counsel.

David C. Greer and Carla J. Morman, for respondent.